UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-24805-MARTINEZ/REID

JORGE LUIZ GONZALEZ,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security
Administration,[1]

      Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court upon Plaintiff Jorge Luiz Gonzalez's Motion for Summary Judgment [ECF No. 14] and Defendant Kilolo Kijakazi, Acting Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment [ECF No. 16]. For the reasons stated below, the Undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED**, and the Administrative Law Judge's ("ALJ") decision be **AFFIRMED**.

## BACKGROUND

Plaintiff appeals the denial of his application for Supplemental Security Income ("SSI"). Plaintiff filed his application for SSI on June 20, 2017, alleging disability beginning June 7, 2017.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security July 2021. Therefore, Kilolo Kijakazi should be substituted for Andrew Saul as the Defendant in this suit, in accordance with Rule 25(d) of the Federal Rules of Civil Procedure. This substitution occurs automatically and does not necessitate action from either party. *See* Fed. R. Civ. P. 12(b)(6); see also 42 U.S.C. § 405(g).

[ECF No. 19 at 26]. Specifically, Plaintiff alleges he suffers from generalized anxiety disorder, obsessive-compulsive disorder (OCD), schizoaffective disorder, and bipolar disorder (major depressive disorder). [*Id.* at 28]. Plaintiff's claim was initially denied on July 27, 2017, and again on December 15, 2017, following reconsideration. [*Id.* at 26]. Plaintiff subsequently filed a written request for hearing. [*Id.*]. On October 18, 2019, a hearing was held before ALJ Lornette Reynolds. [*Id.*]. Plaintiff, represented by counsel, appeared, and testified.  [*Id.*]. Additionally, Jennifer Guediri, a third-party vocational expert ("VE"), also attended the hearing. [*Id.*].

Following the hearing, the ALJ issued a decision denying Plaintiff's claims. *See generally* [*Id.* at 28–37]. Specifically, the ALJ concluded that Plaintiff:

(1) has not engaged in substantial gainful activity since the application date;

(2) suffers from severe impairments, including "Generalized Anxiety Disorder; obsessive-compulsive disorder (OCD); Schizoaffective Disorder; and Bipolar Disorder/Major Depressive Disorder";

(3) does not have an impairment or combination of impairments that meets or medically equals those listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926);

(4) has the Residual Functional Capacity  ("RFC") to perform a full range of work at all exertional levels, albeit with certain nonexertional limitations;

(5) is capable of performing past relevant work as a cleanup worker and material handler (20 CFR 416.965);

(6)  has not been under a disability, as defined in the Social Security Act, since June 20, 2017, the date the application was filed (20 CFR 416.920(f)).

[*Id.*].  A review of the ALJ's decision was requested and denied by the Appeals Council. [*Id.* at 6–8]. Thereafter, Plaintiff sought judicial relief and initiated the instant action. Plaintiff contends that: (1) the ALJ erred by not considering his potential absences or time spent off task at work due to the episodic nature of his impairment; (2) substantial evidence does not support the ALJ's unfavorable decision because the ALJ did not properly evaluate the various medical opinions and

records; (3) the ALJ erroneously declined to afford his treating psychiatrist substantial or considerable weight; (4) the ALJ incorrectly determined his RFC; and (5) the decisions made by the ALJ are constitutionally defective due to a violation of separation of powers. *See generally* [ECF No. 21].

## RELEVANT MEDICAL EVIDENCE

**(1) Treating Medical Personnel**

**(a) Nancy Navarro-Gonzalez, M.D.—Treating Psychiatrist**

Plaintiff's treatment history with Dr. Navarro-Gonzalez dates back to 2010, [EFC No. 19 at 34], with the most recent years consisting of visits "every two to three months." [*Id.* at 34]. As recently as August 2019, Dr. Navarro-Gonzalez noted Plaintiff's schizoaffective disorder, generalized anxiety disorder, and obsessive-compulsive disorder. [*Id.* at 49–51].  Despite these aliments, Plaintiff self-reported "feeling good." [*Id.* at 48]. Plaintiff further noted that it is "not difficult at all" for him to "take care of things at home [] or get along with others." [*Id.* at 53]. Additionally, Dr. Navarro-Gonzalez found Plaintiff lacked signs of depression during follow-up appointments while he was consistent and compliant with his medication and therapy. [*Id.* at 56]. The treating psychiatrist also noted that Plaintiff was never hospitalized for his condition, responded well to medical treatment, and placed no restrictions on his activities. [*Id.* at 608-10]. He showed good judgment, and his recent and remote memory were normal. [*Id.* at 610]. Because Plaintiff was overweight, and his physical health was otherwise normal, the doctor prescribed a diet and exercise. [*Id.* at 574, 584].

On August 1, 2019, Dr. Navarro-Gonzalez completed a Psychiatric and Psychosocial Evaluation on Plaintiff. [*Id.* at 617–636]. In contrast to her treatment notes, in her evaluation, Dr. Navarro-Gonzalez stated Plaintiff had limited ability to function due to his mental health

conditions. *See generally* [*Id.* at 620–21]. She further concluded that Plaintiff would presumably be absent from work "more than four days a month" [*Id.* at 620]; that Plaintiff's impairments were "likely to produce 'good days' and 'bad days'" [*Id.* at 619]; and that Plaintiff has "minimal . . . capacity to adapt to changes in his daily routine." [*Id.* at 622]. While Dr. Navarro-Gonzalez noted these difficulties, she did not impose limitations on Plaintiff's activities or suggest any accommodations to make living with his conditions more navigable. [*Id.* at 619].

### (b) Treating Mental Health Counselor—Krystyna Manso

Plaintiff's treatment history with Mental Health Counselor Krystyna Manso dates back to about November 2016. [*Id.* at 539–541]. Ms. Manso met with Plaintiff on a seemingly monthly basis for services ranging from blood testing to mental health counseling. [*Id.* at 543–562]. As a result, she kept detailed notes about her therapy sessions with him. [*Id.* at 414–15]. Ms. Manso notes on several occasions that Plaintiff (1) either reaches his treatment goals outright or shows promising progress [*id.* at 446, 489, 538, 557, 566]; and (2) responds receptively to her therapeutic techniques. [*Id.* at 482]. Conversely, Ms. Manso notes that Plaintiff's mental impairments have derailed their discussions and his progress on occasion. [*Id.*].

### (2) State Agency Consultants—Dr. Robert Hodes, Dr. Kevin Ragsdale, Dr. Jesse Palmer, Christie Martin, SDM[2]

#### (a) Dr. Robert Hodes and Dr. Kevin Ragsdale – State Psychological Consultants

Following a review of Plaintiff's medical and psychological records and history, state psychological consultants Dr. Robert Hodes and Dr. Kevin Ragsdale both concluded Plaintiff does not meet the disability standards to qualify for SSI. Dr. Hodes, who conducted the Plaintiff's initial

---

[2] A Single Decision Maker (SDM) is an individual who is not a medical expert, yet has the authority to make disability determinations on behalf of the Social Security Administration. *See* Office of the Inspector General, *Single Decision Maker Model — Authority to Make Certain Disability Determinations Without a Medical Consultant Signature*, https://oig.ssa.gov/audit-reports/2013-08-13-audits-and-investigations-audit-reports-A-01-12-11218/ (last visited July 7, 2022).

evaluation, acknowledged Plaintiff had some moderate limitations in his ability to (1) understand, remember, or apply information; (2) concentrate, persist, or sustain attention for prolonged periods; and (3) interact with others. [*Id.* at 117]. Within those categories, Plaintiff's limitation to recall and execute detailed instructions, maintain concentration and attention for lengthy periods, and interact appropriately with supervisors or the general populace were listed as "moderately limited." [*Id.* at 117–18]. Although Dr. Hodes noted Plaintiff's disability claims had "[partial] consistency" with the record evidence, he concluded Plaintiff is ultimately capable of functioning in all areas where he experienced moderate limitation. [*Id.* at 115].

Dr. Ragsdale, who evaluated Plaintiff's reconsideration application, affirmed Dr. Hodes' initial determination that Plaintiff does not qualify for SSI. [*Id.* at 128–130]. Dr. Ragsdale reviewed the most recent clinician notes from November 2017, noting Plaintiff's interaction with medical staff, ease in relaying details and information to the staff at this treatment facility, and self-reported improved affect. [*Id.* at 130]. Additionally, Dr. Ragsdale emphasized that Plaintiff's "cortical functions (e.g. concentration, recent/remote recall, comprehension, communication, thinking reasoning, etc.) were grossly intact." [*Id.*]. Dr. Ragsdale thus concluded that, despite the severity of Plaintiff's mental conditions and the limitations caused them, Plaintiff's mental conditions were "not disabling." [*Id.*].

(b) Christie Martin, SDM- and Dr. Jesse Palmer – State Medical Consultants

Christie Martin, who conducted Plaintiff's initial medical evaluation, noted that despite Plaintiff's documented essential hypertension, he has no physical limitations that would impact his functioning. [*Id.* at 113]. Additionally, Plaintiff's sister plainly stated to Ms. Martin in a phone interview that her brother lacks the interest to complete his daily tasks, but did not speak to his ability to do so. [*Id.* At 358–59]. According to Ms. Martin, this conclusion is consistent with

Plaintiff's medical records which indicate that, while Plaintiff has hypertension, his gait, station, and sensation were all normal. [*Id.* At 113]. Finally, because Plaintiff did not submit any medical records indicating that a healthcare provider-imposed limitations on his physical activities, Ms. Martin concluded Plaintiff's impairment "is considered not severe, as it does not affect function." [*Id.*].

Dr. Jesse Palmer evaluated Plaintiff's reconsideration application and affirmed the decisions made in the initial evaluation. Specifically, Dr. Palmer recognized Plaintiff's mental health medical records and essential hypertension diagnosis but highlighted the absence of "allegations of physical compromise affecting functional ability." [*Id.* at 128]. In affirming the initial determination that Plaintiff is "not disabled," Dr. Palmer reiterated Plaintiff's non-severe physical conditions.  [*Id.*].

## HEARING TESTIMONY

At the hearing held on October 18, 2019, before the ALJ, Plaintiff, who was fifty-five years old, asserted entitlement to SSI based on his listed impairments including generalized anxiety disorder, obsessive-compulsive disorder (OCD), schizoaffective disorder, bipolar disorder/major depressive disorder, obesity, and hypertension. [ECF No. 22 at 2; ECF No. 19 at 122]. During his testimony, Plaintiff disclosed that he had not completed his primary education in Cuba, but instead discontinued schooling after not passing the 11th grade. [ECF No. 19 at 69–70]. Plaintiff noted, however, that despite his education level and inability to communicate in English, [*Id.* at 75], he was able to procure employment in the United States as a physical laborer. [*Id.* at 69–71]. At his most recent job in 2009, he worked for an agency which required him to garden and clean the floor and loaded and loaded boxes at a warehouse. [*Id*. at 75–76]. He claimed he stopped working because his mental conditioned "worsened." [*Id*. at 76-79]. The stated that he would "feel voices"

and "think [he] communicate[d], mentally with people" then would "lock eyes with somebody …stop thinking…and become panicky." [*Id.* at 76]. He noted that the medication he takes decreases his symptoms and, when he takes the medication every morning, the feelings decrease in two hours. [*Id.* at 79].

Plaintiff asserted he takes many medications to treat symptoms of his various ailments. [*Id.*]. He testified that the medications do not eradicate all his symptoms but admitted they do help. [*Id.*]. Notwithstanding this, Plaintiff argued he is unable to work and is thus entitled to SSI, because he struggles with many symptoms ranging from lack of motivation [*Id.* at 80] and difficulty concentrating [*id.* at 81] to lack of basic social skills [*id.* at 76] and difficulty trusting others. [*Id.* at 79]. Plaintiff further asserted that while his medications helped his symptoms, they are not without side effects and can leave him feeling sleepy or otherwise incapacitated. [*Id.* at 84]. Further, Plaintiff contended his physical condition--being overweight--exacerbated the severity of his mental health conditions. [*Id.* at 67–68].

Despite these limitations Plaintiff, who resides with his sister and brother-in-law, asserted that he can bathe and dress himself, and that although he relies on his family to supply him with hot meals and water, he is able to feed himself. [*Id.* at 84–86]. Plaintiff, however, claimed he has no desire to eat, and often skips meals as a result. [*Id.* at 84]. Similarly, he contends that, at times, he will go up to a week without showering and will wear the same clothes unless his sister reminds him to shower and change. [*Id.* at 86].

Regarding his daily schedule, Plaintiff stated he takes his medicine immediately upon waking, isolates himself while waiting for the effects of the medication, rests intermittently, feeds his six dogs, remains preoccupied with difficult thoughts when his medications stop working, and finally collapses into fitful sleep. [*Id.* at 83–86]. Once weekly, Plaintiff will attend an outing with

his housemates. He holds a driver's license and drives while his brother-in-law is in the car with him on weekends to go shopping at "the market." [*Id.* at 73–74].

Testimony by Vocational Expert Jennifer Guediri

Prior to testifying, Vocational Expert, Jennifer Guediri reviewed the vocational evidence of the record. [*Id.* at 90–91]. She was also present for Plaintiff's testimony. [*Id.*]. Ms. Guediri noted that Plaintiff had prior work experience as a cleanup worker and as a material handler. [*Id.* at 91]. Based on Ms. Guediri's review of the vocational evidence on the record and Plaintiff's testimony, and taking into consideration Plaintiff's impairments, she concluded there were jobs in the national economy Plaintiff would be able to engage in. Specifically, she concluded that the jobs Plaintiff previously held—cleanup worker, and/or material handler—were not outside the scope of his functionality at the time of filing. [*Id.* at 96–97]. Ms. Guediri claimed Plaintiff can maintain employment in these roles, as they involve repetitive work with only occasional co-worker interaction. [*Id.* at 97–98].

The ALJ posed a hypothetical to Ms. Guediri to hear her expert opinion regarding whether a claimant with Plaintiff's characteristics and limitations could "perform any of claimant's past work" as a "material handler" or a "cleanup worker." [*Id.* at 96–97]. Ms. Guediri stated that he could. [*Id.*]. Plaintiff's counsel then questioned Ms. Guediri regarding "how many days per month [Plaintiff] could miss work . . . and still be employable." [*Id.* at 98].  Ms. Guediri acknowledged that routinely missing more than one day of work a month "would not be permitted." [*Id.*]. With the ALJ's approval, Plaintiff's counsel added additional limitations to the hypothetical. [*Id.* at 98–102].  Counsel questioned whether a claimant would be employable if he missed more than four days per month. [*Id.* at 99–100]. Plaintiff's counsel emphasized that Plaintiff's treating physician Dr. Navarro-Gonzalez had reported that Plaintiff would likely be absent from work more than four

days per month because of his impairment [*Id.*]. Ms. Guediri affirmed that with such limitations claimant would be unemployable. [*Id.*].

Plaintiff further questioned whether a hypothetical claimant who would have serious limitations "in the ability to understand and remember short, simple instructions," could do that work. [*Id.* at 100]. Ms. Guediri agreed that such an employee would be unable to maintain a job on a full-time basis. [*Id.*]. Ms. Guediri opined the same would be true of a claimant who exhibited serious limitations in their ability to "carry out simple instructions," "interact appropriately" with supervisors and coworkers, and "respond appropriately to work pressures." [*Id.* at 100–02].

## **RELEVANT LAW**

### Standard of Review

Federal courts reviewing a social security appeal are to employ "a deferential reconsideration of the findings of fact and [an] exacting examination of the conclusions of law." *Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011). This inquiry is governed by the "substantial evidence" standard which provides the

> Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the review finds that the evidence preponderates against the Commissioner's decision.

*Kieser v. Barnhart*, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted). The Supreme Court of the United States has explained that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Importantly, the reviewing court is prohibited from reweighing evidence already considered by the ALJ. *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir.

2014). Despite this deferential standard, the Commissioner's conclusions of law, done through the ALJ, are not afforded the same presumption of validity. *Williams*, 416 F. App'x at 862. Rather, the Commissioner's legal conclusions are reviewed *de novo*. *See Hargress v. Comm'r of Soc. Sec.*, 883 F.3d 1302, 1305 n.2 (11th Cir. 2018).

Regulatory Framework

The Social Security Regulations provide the ALJ with a five-step "sequential" evaluation process to determine whether a claimant has established they are disabled. If at any step of the sequential evaluation the ALJ determines a claimant is or is not disabled, the ALJ concludes the inquiry and does not evaluate the next step. 20 C.F.R. § 416.920(a)(4).

The first step requires the ALJ to determine whether the claimant is engaged in "substantial gainful activity" ("SGA"). If the claimant is engaged in SGA then he or she is not deemed disabled and the ALJ's inquiry ends. *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004). Step two requires the ALJ to evaluate whether a claimant's alleged impairments are "medically severe." If the claimant's impairments are found to be medically severe the ALJ is to proceed to step three. *Id.* at 1237. In the third step, the ALJ must decide if any of the claimant's proffered impairments, individually or in combination, "meet or equal" any of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. *Id.* at 1238. If so, the ALJ proceeds to the fourth step.

Step four requires the ALJ to undertake a two-part analysis. First, the ALJ must assess the claimant's "residual functional capacity" ("RFC"). Second, based on claimant's RFC, the ALJ must determine whether claimant can return to any "past relevant work." Lastly, the fifth step, in which the claimant no longer bears the burden, requires the ALJ to determine whether, given a claimant's age, education, work experience, and RFC, the claimant can perform any work. Essentially, during this step the

ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. If the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled.

*Philips*, 357 F.3d at 1239.

## **DISCUSSION**

Plaintiff asserts the ALJ erred in the following five ways:

I.   The ALJ did not make a finding on the amount of time Plaintiff is likely to be off task at work or entirely absent from work, and thus did not fully consider the impact of his impairments on employment.

II.  The ALJ's finding that Plaintiff's impairment or combination of impairments did not meet the severity of any listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 is not supported by the substantial evidence of Plaintiff's records.

III. The ALJ did not properly afford substantial or considerable weight to Plaintiff's long-time treating psychiatrist, Dr. Navarro-Gonzalez.

IV.  The ALJ failed to sufficiently evaluate Plaintiff's medical records and claims; therefore the Residual Functional Capacity finding is not supported by the Substantial evidence of the record.

V.   The decision by the ALJ and appeals council judges who derived their authority from the Commissioner of Social Security, is constitutionally defective because "the appointment of [the Acting Commissioner] as a Commissioner of the Social Security Administration who is removable only for cause and serves a longer term than that of the President violates the separation of powers."

[ECF No. 21].

Because the ALJ is required to follow a five-step sequential evaluation process to evaluate Plaintiff's claim, the Undersigned will discuss Plaintiff's arguments within that framework.

I.      **The ALJ's finding that the Plaintiff does not have an impairment or combination of impairments that is equivalent to that of any listed impairments is supported by the substantial evidence of the records.**

In evaluating the SSR's five-part regulatory framework to determine whether a claimant has established their disability, the ALJ concluded Plaintiff satisfied the first two steps because he (1) had not engaged in Substantial Gainful Activity since June 20, 2017; and (2) suffered from several severe impairments. [ECF No. 19 at 28].  At step three, however, the ALJ concluded Plaintiff's impairments, individually or in combination, do not meet or equal the criteria of those listed in the Social Security Administration's listing of impairments. [*Id.* at 29]. Specifically, the ALJ acknowledged that, while Plaintiff's impairments do impact him in some ways, they have not extremely limited his functionality. [*Id.* at 29–31].

In his **second claim** of error, Plaintiff contests the ALJ's finding that he does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (R. 24). Substantial evidence in the record, however, does support the ALJ's finding. The ALJ noted Plaintiff's numerous mild or moderate limitations, as well as his good insight, normal remote memory, appropriate interactions with family at home, and ability to practice his faith. [*Id.* at 34]. Further, the ALJ noted Plaintiff was able to operate his sister's vehicle with supervision weekly, care for nine small dogs, and interact appropriately with treatment providers. [*Id.*]. These abilities, combined with Plaintiff's generally good grooming, logical thought process, and responsiveness to minimally invasive treatments, served, in part, to support the ALJ's conclusion that Plaintiff did not meet the step three

criteria. [*Id.* at 29–30; 34]. This information, as well as other record evidence, is sufficient to affirm the ALJ's decision.

This is not to say the medical record shows Plaintiff did not struggle with his mental health. Instead, it demonstrates there is sufficient and substantial record evidence to support the ALJ's conclusion that Plaintiff's mental health impairments did not rise to the level of disabling impairments.

This Court therefore recommends that Plaintiff's Motion for Summary Judgment on the basis of insubstantial evidence to support the ALJ's impairment determination be DENIED.

## II. The ALJ's complied with Social Security Ruling 96-8 and the ALJ's Residual Functional Capacity determination is supported by substantial record evidence.

The determination that Plaintiff has the Residual Functional Capacity to conduct "past relevant work" is supported by substantial record evidence.

Step four's two-pronged analysis requires the ALJ to first assess a claimant's RFC, and second utilize the RFC assessment to appraise whether the claimant can execute any "past relevant work" at their current level of functionality. *See* 20 C.F.R. § 404.1545(a)(5). SSR 96-8 provides that the "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p(5). It is intended to encompass "impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [a claimant] can do in a work setting." *See* 20 C.F.R. § 404.1545(a).

In his **fourth claim** of error, Plaintiff asserts that substantial evidence does not support the ALJ's finding that he has the Residual Functional Capacity to maintain employment. The record, however, supports the ALJ's finding to the contrary.

Here, to support his disability claim, Plaintiff submitted his medical records, physician treatment notes, therapy progress notes, and his own testimony. *See generally* [ECF No. 19 at 407–

08, 420, 426–434, 440–678]. Several of these physician treatment notes predated his alleged onset date, yet the ALJ still reviewed them. [*Id.* at 32]. Following that, the ALJ divulged the details of her decision. *See generally* [*Id.* at 26–37]. In the doctor's office, Plaintiff self-reported "feeling good," [*Id.* at 48, 449, 476], neglected to mention "sleep disturbances" or negative medication side effects, [*id.* at 33], and demonstrated decent cognitive function and overall social skills. [*Id.* at 30]. In therapy, Plaintiff communicated his thoughts to healthcare providers sufficiently, participated in self-improvement exercises and activities, and demonstrated the ability to improve his mental health over time. [*Id.* at 446, 489, 538, 557, 566]. Once in court, however, the ALJ recognized a juxtaposition between the evidence previously submitted, and Plaintiff's testimony before her. [*Id.* at 29–30, 33]. Despite this, ALJ Reynolds listened to Plaintiff's testimony in full, and considered it when she made her decision. The opinion elaborates that the ALJ found inconsistencies between the magnitude of the symptoms Plaintiff testified to in court, and the magnitude of the symptoms documented in Plaintiff's records. [*Id.* at 32]. These discrepancies in conjunction with the efficacy of Plaintiff's conservative treatment led ALJ Reynolds to question Plaintiff's credibility and defer to Plaintiff's medical records most extensively when making her RFC determination. That ALJ Reynolds scrutinized Plaintiff's file to establish the extent of Plaintiff's impairment is well within her discretion, and discounting what is not supported in Plaintiff's record is not a basis for remand. *See See Borges v. Comm'r of Soc. Sec.*, 878, 881 (11th Cir. 2019) (reasoning that "the ALJ's assessment of [the plaintiff's] RFC is supported by substantial evidence" because even "[a]fter properly discounting the medical opinions of [two of plaintiff's Doctors], the ALJ could still properly rely on [a third Doctor's] medical opinion, the non-opinion medical evidence in the record, and the other evidence, such as the hearing testimony of [plaintiff] and the VE, in formulating the RFC.") Finally, the ALJ noted two State Agency consultants that reviewed

Plaintiff's records independently reached a similar conclusion. All of the above further strengthened the ALJ's conclusion that, while Plaintiff undoubtedly suffers from several severe impairments, his Residual Functional Capacity does not render him entirely unable to work.

This Court therefore recommends that Plaintiff's Motion for Summary Judgment on the basis of insubstantial evidence to support the ALJ's Residual Functional Capacity determination be DENIED.

**III.   The ALJ adequately considered the extent of Plaintiff's impairments, and its finding that Plaintiff is capable of full-time employment is grounded in substantial record evidence.**

As noted above, the SSR evaluation framework's second prong of the fourth step entails the evaluator considering whether a claimant can return to any "past relevant work." In Plaintiff's **first claim** of error, he argues that substantial evidence does not support the ALJ's finding that he is able to attend work regularly and remain on-task throughout the workday. Despite this contention, the record supports the ALJ's finding.

"Where, as here, there are nonexertional limitations, the ALJ 'must introduce independent evidence, preferably through a vocational expert's testimony,' of the existence of such jobs." *Samuels v. Acting Comm'r of Soc. Sec.*, 959 F.3d 1042, 1046 (11th Cir. 2020). Further, "[i]n order for the [Vocational Expert]'s testimony to constitute substantial evidence, 'the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.'" *Id.*

In keeping with the Eleventh Circuit, ALJ Reynolds consulted a Vocational Expert during the hearing, and directed several questions at the VE which sought to address the vocational viability of a hypothetical claimant with Plaintiff's specific impairments and experience. For example, ALJ Reynolds inquired whether a claimant who would only be able to "understand, remember, and carry out simple, routine, repetitive tasks and instructions" and tolerate "only

occasional interaction with the public" could still perform Plaintiff's "past relevant work." [ECF No. 19 at 96]. These hypothetical inquiries were tailored to Plaintiff's documented conditions and sought to address the limitations associated with his mental impairments. Furthermore, the ALJ encouraged Plaintiff's attorney to elicit testimony from the VE to address Plaintiff's conditions to his satisfaction. [*Id.* at 97, 99–100, 102]. While the ALJ did not explicitly ask the VE questions regarding Plaintiff's prospective work attendance or time spent off task, the ALJ allowed Plaintiff's counsel to do so, listened to the response, and considered the VE's responses in addition to the other evidence Plaintiff offered.

This comprehensive approach is entirely distinguishable from that of the ALJ in the *Samuels* case. There, the ALJ only "asked the VE to assume: (1) [the plaintiff's] education and work experience; (2) that [the plaintiff] had certain physical limitations . . . ; (3) that [plaintiff] have 'only occasional exposure' to unprotected heights and dangerous equipment; (4) that [plaintiff] 'would be able to understand, remember and carry out short, simple work instruction'; and (5) that she 'had only occasional interaction with the public." *Samuels*, 959 F.3d at 1046. The *Samuels* ALJ had evidence of the severity of the plaintiff's cyclical mental health condition that rendered her unable to work when her condition worsened. *See id.* As a result, the Court held that failing to "account for unexcused absences or time spent off-task, which were limitations caused by [the plaintiff's] bipolar disorder *that were reflected in the record*," was reversible error. *See id.* at 1047 (emphasis added).

Here, Plaintiff has not worked since "[a]pproximately [] March of 2009," but began treatment with Dr. Navarro-Gonzalez in 2010. [ECF No. 19 at 70]. As such, there is no evidence presented to the court demonstrating instances where Plaintiff's conditions, once he received treatment, have rendered him unable to work. Furthermore, the ALJ permitted Plaintiff's counsel

to question the VE about the potential impacts of consistent work absences or time spent off task. In her order, the ALJ directly addressed Plaintiff's expected work attendance and mental capacity to remain on-task during a theoretical workday. [ECF No. 19 at 31]. In the section entitled "Findings of Fact and Conclusions of Law," ALJ Reynolds explained that she had carefully reviewed Plaintiff's medical records which supported a finding that Plaintiff "is able to sustain attention and concentration [] for two-hour periods of time and for 8 hours in the workday on simple, routine, repetitive tasks and instructions," "can maintain regular attendance and be punctual within customary tolerances," and " can perform activities within a schedule." [*Id.*].  The ALJ explained in detail why Dr. Navarro-Gonzalez's treatment notes in conjunction with his statements to his psychiatrist and mental health counselor did not support the limitations suggested. [*Id*. at 33-35]. Given the ALJ's meticulous review of the record and robust reasoning in her opinion, the ALJ's findings that neither Plaintiff's impairments nor treatments will render him entirely unable to work are supported by substantial record evidence.

This Court therefore recommends that Plaintiff's Motion for Summary Judgment on the basis of the ALJ failing to consider the extent of Plaintiff's episodic conditions be DENIED.

**IV.    The ALJ refrained from affording substantial weight to Dr. Navarro-Gonzalez's opinions due to her inconsistent evaluation of the Plaintiff and discrepancies in Plaintiff's reported condition and his treatment plan.**

In his **third claim** of error, Plaintiff asserts that the ALJ erred by declining to give Dr. Navarro-Gonzalez's opinion considerable or substantial weight but, the ALJ correctly highlighted that the opinions of treating physicians are noncompulsory pursuant to 20 C.F.R. § 404.1520c (2017), which "instructs administrative law judges to give a treating physician's opinion no deference and instead to weigh medical opinions based on their persuasiveness." *Harner v. Soc. Sec. Admin., Comm'r*, No. 21-12148, 2022 WL 2298528, at *1 (11th Cir. June 27, 2022). Indeed,

the regulation states that "'[f]or claims filed ... on or after March 27, 2017,' an administrative law judge must 'not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources.'" *Id*. at *3. Instead, an ALJ is to consider several factors in determining what weight to give the claimant's proffered medical opinions. *See id*. "Those factors include the supportability of the medical opinion, its consistency with other record evidence, the physician's relationship with the claimant, the physician's specialty, and other relevant information, such as the physician's familiarity with the other record evidence and with making a claim for disability." *Id*.

Here, ALJ Reynolds weighed all evidence ranging from Plaintiff's medical records to State Agent psychologist opinions. In doing so, the ALJ found Dr. Navarro-Gonzalez's opinion unpersuasive for several reasons. First, there were discrepancies between Dr. Navarro-Gonzalez's own clinical notes and her statements regarding Plaintiff's condition. [ECF No. 19 at 34]. Second, Dr. Navarro-Gonzalez claimed that Plaintiff had a medically documented neurocognitive disorder, but Plaintiff provided no corroborating records, and when the ALJ asked Dr. Navarro-Gonzalez to provide clinical findings to support her assessments, she declined to do so. [*Id.*]. Third, Dr. Navarro-Gonzalez repeatedly claimed that Plaintiff was severely limited in several aspects of his daily life, but steadily decreased his medicine dosage and declined to suggest any restrictions or modifications to accommodate Plaintiff's alleged limitations.  [*Id.* at 34–35]. Finally, most of the above claims were made by Dr. Navarro-Gonzalez on fill-in-the-blank forms or check-box forms with no subsequent explanation provided in the space below. *See generally* [*Id* at 617–636.] These forms are not uncommon for doctors to utilize; however, such forms do not generally serve as indisputable evidence unless accompanied by other records to corroborate them. *See Swarthout v.*

*Kijakazi,* 35 F.4th 608, 611 (8th Cir. 2022) ((holding that the ALJ "did not err in giving little weight to an assessment that consisted of 'nothing more than vague, conclusory statements— checked boxes, circled answers, and brief fill-in-the-blank responses.'") (quoting *Thomas v. Berryhill*, 881 F.3d 672 (8th Cir. 2018)). Based on a review of the record as a whole, the ALJ concluded that Dr. Navarro-Gonzalez's opinion was unsupported. That decision was not erroneous.

It is also worth noting that Plaintiff's argument would have also failed under the previous, stricter standard. Prior to March 2017, Eleventh Circuit held that "good cause exists for affording less weight to a treating physician's opinion when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Whitton v. Comm'r, Soc. Sec. Admin*, 643 Fed. Appx. 842, 845 (11th Cir. 2016) (quoting *Phillips*, 357 F.3d at 1240–41). Under that standard, the ALJ's decision here would still stand under prongs 1 and 2.

In conclusion, ALJ Reynolds plainly stated the reasons for declining to accord Dr. Navarro-Gonzalez's opinion substantial weight, and this reasoning is consistent with both the Code of Federal Regulations and Eleventh Circuit precedent. Considering the highly deferential substantial evidence standard, and the inability of this Court to reweigh the evidence, there are no grounds for reversing the ALJ's decision.

This Court therefore recommends that Plaintiff's Motion for Summary Judgment on the basis of the treating physician rule be DENIED.

## V.     The ALJ's Decision is not Void Under *Collins v. Yellen*

Finally, in his **fifth claim** of error, Plaintiff argues that the judgment issued by the ALJ in this case is "constitutionally defective" because 42 U.S.C § 902(a)(3) violates separation of powers

in his fifth claim of error. [ECF No. 21 at 27]. Specifically, citing to *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020), Plaintiff avers that the SSA is "an executive agency…led by a single head who serves for a longer term than the President and can only be removed from his position for cause," and that this "structure" is unconstitutional. [*Id.*]. Plaintiff further contends the ALJ's ruling is "constitutionally defective" because the ALJ's delegation of authority in this case came from the Commissioner and because the ALJ "decided the case under regulations promulgated by [the Commissioner] when [he] had no constitutional authority to issue those rules." [*Id.* at 27-28].

Defendant counters that, even if the statute is unconstitutional, Plaintiff has not shown a nexus between the unconstitutional statute and the denial of benefits in his case as the Supreme Court explained in *Collins v. Yellen*, 141 S. Ct. 1761 (2021). [ECF No. 26 at 23-29]. In *Collins*, the Supreme court addressed a similar issue. *See* 141 S. Ct. at 1783-89. There, a statutory provision protected the Director of the Federal Housing Finance Authority ("FHFA") from removal by the President except for cause. *Id.* at 1783-84. Citing *Seila Law*, the Court found that, because the FHFA is an agency led by a single Director, the statute's "for-cause restriction on the President's removal authority violate[d] the separation of powers." *Id.* After determining the statute was unconstitutional, however, the Court held that to be entitled to retrospective relief, Plaintiffs had to show that they suffered "compensable harm." *Id.* at 1789. The Court explained two instances in which compensable harm could be shown in cases like this one:

> [I]t is still possible for an unconstitutional provision to inflict compensable harm. And the possibility that the unconstitutional restriction on the President's power to remove a Director of the FHFA could have such an effect cannot be ruled out. Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he

would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id*.

Plaintiff has failed to make such a showing here. Specifically, Defendant states that Plaintiff cannot show the required nexus because (1) the ALJ who issued the decision in Plaintiff's case had her appointment ratified by an Acting Commissioner who was not subject to 42 U.S.C § 902(a)(3) and thus could have been removed at any time; and (2) Plaintiff cannot show how the statute inflicted compensable harm on him. This Court agrees with Defendant.

First, the *Collins* Court made clear that if a statute like the one at issue "does not restrict the removal of an Acting Director, any harm resulting from actions taken under an Acting Director would not be attributable to a constitutional violation." *Id*. at 1765, 1781. The ALJ in this case had her appointment ratified by then-Acting Commissioner Nancy Berryhill, who was not protected from removal under 42 U.S.C § 902(a)(3) and was thus removable at will. To that end, "any ratification of an ALJ by Nancy Berryhill would make that appointment constitutional." *Castro v. Kijakazi*, No. 21-CV-80569, 2022 WL 1812248, at *10 (S.D. Fla. Apr. 14, 2022), *report and recommendation adopted*, No. 21-80569-CIV, 2022 WL 1801217 (S.D. Fla. June 2, 2022) (citing *Boger v. Kijakaz*i, No. 1:20-cv-331, 2021 WL 5023141, at *3 n.4 (W.D.N.C. Oct. 28, 2021)); *see also Fernandez v. Kijakazi*, No. 20-22798-CIV, 2022 WL 1642708, at *9 n.3 (S.D. Fla. Mar. 24, 2022) ("Indeed, in response to the Supreme Court's holding in *Lucia*, on July 16, 2018, then Acting Commissioner of the SSA, Nancy Berryhill, ratified the appointments of all ALJs and approved those appointments as her own, 'to address any Appointments Clause questions involving SSA claims.'") (citing Soc. Sec. Admin., EM-180003 REV 2, Important Information Regarding Possible Challenges to the Appointment of Administrative Law Judges in SSA's Administrative Process—UPDATE (2/6/2018)). Because the ALJ's appointment was properly ratified in this case,

Plaintiff cannot seriously contend that the ALJ's appointment and authority were tainted by the unconstitutionality of 42 U.S.C § 902(a)(3).

Second, in *Collins*, the Court explained that "the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing [regulations]." 141 S. Ct. at 1788 n.23 (citing *Seila Law*, 140 S. Ct. at 2207-2211). Thus, under *Collins*, despite the unconstitutionality of 42 U.S.C § 902(a)(3), the then-Commissioner of Social Security had full authority to issue the regulations used to decide Plaintiff's case. Therefore, Plaintiff's argument that he was harmed simply because his case was decided under those regulations also fails.

Third, outside of the foregoing rejected arguments Plaintiff fails to "allege with any level of detail how the removal restrictions of § 902(a)(3) inflicted compensable harm upon [him]." *Vergara v. Kijakazi*, No. 20-22964-CIV, 2022 WL 769704, at *8 (S.D. Fla. Feb. 23, 2022), *report and recommendation adopted sub nom. Vergara v. Comm'r of Soc. Sec.*, No. 20-22964-CIV, 2022 WL 767125 (S.D. Fla. Mar. 14, 2022). Indeed, "Plaintiff has alleged no direct action by the former tainted Commissioner himself in [his] denial of benefits, and no involvement—or even awareness—by the former President in the ALJ's decision." *Id.* (citing *Collins*, 141 S. Ct. at 1802 (Kagan, J. concurring) ("[G]iven the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone ... When an agency decision would not capture a President's attention, his removal authority could not make a difference.")). In fact, Plaintiff has raised no counterarguments on this issue. *See* [ECF No 29 at 14] ("Plaintiff herein incorporates and reasserts Plaintiff's Argument 5 from Plaintiff's MSJ, and has nothing more to add regarding Plaintiff's argument 5.").

Because Plaintiff's arguments lack merit and he has failed to otherwise allege with plausibility that he has suffered any compensable harm under 42 U.S.C § 902(a)(3), his claims necessarily fail. *See e.g. Vergara v. Kijakazi*, 2022 WL 769704, at *8; *Castro*, 2022 WL 1812248, at *12; *Fernandez*, 2022 WL 1642708, at *10; *Watson v. Kijakazi*, No. 21-CV-60516, 2022 WL 1693388, at *7 (S.D. Fla. May 3, 2022), *report and recommendation adopted*, No. 21-CV-60516, 2022 WL 1686526 (S.D. Fla. May 26, 2022); *Ragusa v. Kijakazi*, No. 21-CV-80235, 2022 WL 1479405, at *7 (S.D. Fla. Feb. 15, 2022), *report and recommendation adopted*, No. 21-80235-CIV, 2022 WL 1012898 (S.D. Fla. Apr. 5, 2022); *Eutsay v. Kijakazi*, No. 21-21164-CV, 2022 WL 1609088, at *10 (S.D. Fla. May 4, 2022), *report and recommendation adopted sub nom. Eutsay v. Comm'r of Soc. Sec. Admin.*, No. 21-CV-21164, 2022 WL 1605318 (S.D. Fla. May 20, 2022); *Alicea v. Kijakazi*, No. 21-60760-CIV, 2022 WL 902858, at *10 (S.D. Fla. Mar. 11, 2022), *report and recommendation adopted sub nom. Alicea v. Saul*, No. 21-60760, 2022 WL 898563 (S.D. Fla. Mar. 28, 2022); *Gutierez v. Kijakazi*, No. 20-CV-25321, 2022 WL 977055, at *8 (S.D. Fla. Mar. 2, 2022), *report and recommendation adopted sub nom. Gutierrez v. Kijakazi*, No. 20-CIV-25321, 2022 WL 970864 (S.D. Fla. Mar. 31, 2022); *John v. Kijakazi*, No. 20-61123-CIV, 2022 WL 718667, at *6 (S.D. Fla. Mar. 1, 2022), *report and recommendation adopted sub nom. Agnes v. Comm'r of Soc. Sec.*, No. 20-61123-CIV, 2022 WL 715188 (S.D. Fla. Mar. 10, 2022); *Tucker v. Kijakazi*, No. 21-60943-CIV, 2022 WL 750559, at *13 (S.D. Fla. Feb. 8, 2022), *report and recommendation approved*, No. 21-60943, 2022 WL 742744 (S.D. Fla. Mar. 11, 2022); *Ramos v. Kijakazi*, No. 21-60105-CIV, 2022 WL 1105799, at *7 (S.D. Fla. Jan. 26, 2022), *report and recommendation adopted*, No. 21-60105-CIV, 2022 WL 1103254 (S.D. Fla. Apr. 13, 2022).

This Court therefore recommends that Plaintiff's Motion for Summary on the basis of separation of powers be DENIED.

## CONCLUSION

Because ALJ Reynolds' decision is supported by substantial evidence and is based on proper legal standards, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment [ECF No. 14] be **DENIED**, the Commissioner's Motion for Summary Judgment [ECF No. 16] be **GRANTED**, and the ALJ's decision be **AFFIRMED**.

Objections to this Report may be filed with the district judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 20th day of July, 2022.

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc:    **United States District Judge Jose E. Martinez;**

       **All Counsel of Record**

24